IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTOPHER B. FLEMING, SR.,

    Petitioner,

    v.

WARDEN,

    Respondent.

Civil Action No.:  GLR-19-1059

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Petitioner Christopher B. Fleming, Sr. Petition for Writ of Habeas Corpus (ECF No. 1). The matter is ripe for review, and no hearing is necessary. <u>See</u> Rule 8(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>; Local Rule 105.6 (D.Md. 2018); <u>see also</u> <u>Fisher v. Lee</u>, 215 F.3d 438, 455 (4th Cir. 2000) (noting that petitioners are not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons outlined below, the Petition will be dismissed and the Court will decline to issue a certificate of appealability.

## I.     BACKGROUND

Petitioner Christopher B. Fleming, Sr. is an inmate who is presently incarcerated at Eastern Correctional Institution in Westover, Maryland. On April 6, 2016, following a jury trial in the Circuit Court for Wicomico County, Fleming was convicted on charges of burglary, theft, and malicious destruction of property in connection with the misappropriation of a house in foreclosure. He is currently serving a ten-year sentence.

A.      **Facts Established at Trial**

In May 2014, the property located at 27849 Cross Creek Drive in Wicomico County, Maryland was the subject of a foreclosure proceeding. (Answer Pet. Writ Habeas Corpus ["Answer"] Ex. 1 ["State R."] at 87, ECF No. 7-1). In October 2014, the Federal Home Loan Mortgage Corporation ("Freddie Mac") purchased the property at auction. (Answer Ex. 2 ["Trial Tr."] at 95, 212, ECF No. 7-2). Two months later, a judge approved the sale, making Freddie Mac the new legal owner of the property. (Id. at 95).

Freddie Mac contracted with real estate agent Sheri Smith to be the caretaker of the property. (Id.). Smith testified that she had someone drive by the property every seven to fourteen days to make sure the property was secure, no one was moving in, and the property was not damaged. (Id. at 151). In addition, Smith spent about $15,000 on renovations to the property after the foreclosure was ratified. (Id.). On January 7, 2015, Smith received notification from Freddie Mac that the property had "cleared its legal status" and she began preparations to market the property. (Id. at 152). At that time, Smith posted a notice on the property giving any occupants or people that may have an interest in the property fifteen days to contact her office. (Id.). When no one responded, Smith, at the behest of Freddie Mac, entered the house and changed the locks. (Id. at 152, 154).

On March 23, 2015, Smith arranged for Brice Truitt, a heating and air conditioning service technician, to go to the property to address the lack of heat inside the house. (Id. at 114). Truitt used a key provided by Smith in a lock box that hung on the doorknob to gain entry to the property. (Id.). He repaired the unit, turned it back off, and locked up the house before leaving. (Id. at 115).

Smith also arranged for a plumber to go to the property on April 21, 2015 to repair a leak. (Id. at 156–57). When the plumber arrived, he noticed curtains in the window and thought he was at the wrong address. (Id. at 157). After the plumber confirmed that he was at the correct address, he sent Smith pictures showing that security cameras had been installed and the lockboxes were missing. (Id.). Smith then called the police. (Id.). When Smith arrived at the property, she discovered the locks had been changed and she could not gain access to the house. (Id. at 159).

DFC Cameron Gardner went to the property in response to Smith's 9-1-1 call. (Id. at 131). At trial, Gardner described the interior of the house as having furniture and security cameras but no refrigerator or stove. (Id. at 137). Gardner added that there was a "George Foreman grill and a cooler" in the kitchen as well as food and several items of clothing. (Id.). Additionally, the electricity was on and working inside the house. (Id.). When shown a picture of the house, Gardner stated that the notices to vacate and no trespassing signs had been removed from the storm door when he arrived at the house and a blue magnetic sign displaying "Fleming Construction" was posted on the front of the garage. (Id. at 138). Gardner additionally testified that a bag with doorknobs and lockboxes was found inside the house. (Id.). On cross-examination, Gardner stated there were no signs of forced entry into the home and that the lockboxes found inside the house did not appear to be damaged. (Id. at 144).

Upon arriving at the property, Gardner spoke with Smith and Vaughn Parker, the man who had been living in the house. (Id. at 132–33). Parker called Christopher Fleming on the phone, identified Fleming as the owner of the property, and gave the cell phone to

3

Gardner to speak with Fleming. (Id. at 133). Fleming told Gardner that he owned the property because he had filed a "lis pendens for the adverse possession of the property." (Id.). Gardner asked Fleming to come to the property to discuss the matter. (Id. at 133–34). According to Gardner, Fleming never claimed that Smith gave him permission to live, work, or enter the house. (Id. at 141–42). Likewise, Smith testified that she never hired Fleming or offered to rent the house to him, and that Fleming never paid her for the time he occupied the house. (Id. at 160). Smith further testified that the fair market value for renting the property was between $1,400 and $1,500 per month. (Id. at 161). After Gardner told Fleming to leave the premises on April 21, 2015, police conducted regular patrol checks of the property, and Fleming did not return to the property. (Id. at 144–45).

Parker testified that he was living in the house because he needed a place to live and Fleming, who is Parker's cousin, offered the property for his use. (Id. at 121). Fleming told Parker he was "in the middle of paperwork" regarding the house but that it was "legal" for Parker to stay there. (Id.). Parker lived there for approximately two weeks and entered the house using a key provided to him by Fleming. (Id. at 121–22). Parker explained that Fleming was allowing him to live there rent-free, but he paid to have the hot water heater replaced and to have the house furnished. (Id. at 123). Parker stated that he found a bag full of doorknobs in the house when he moved in, which he simply placed in a closet. (Id. at 124). Parker also testified that he used a code for the garage door as well as a key to the house to gain entry. (Id. at 126).

Fleming had filed an adverse possession claim regarding the property in the Wicomico County Circuit Court on March 20, 2015. (Id. at 213). Fleming alleged in the

lawsuit that he had occupied the property for five years. (Id.). At trial, over defense counsel's objection, the state introduced into evidence a notice the court sent to Fleming advising that if he did not file anything else in the adverse possession case within thirty days it would be dismissed for failure to prosecute.[1] (Id. at 170–71).

At the close of the state's case-in-chief, defense counsel moved for a judgment of acquittal, arguing that the state had failed to present any evidence of an intent to commit a theft or that a theft actually occurred inside the property. (Id. at 174–75). Counsel further argued there was no evidence that any property of a value over $1,000 had been removed from the property or that Fleming had broken into the house. (Id. at 176–77). In rebuttal, the state relied on the holding in Hobby v. State, 83 A.3d 794, 806–07 (Md. 2014), to support the argument that "one using a vacant property without the owner's consent owes the fair market value of that property to the owner, or suffers potential charges of first-degree burglary and theft." (State R. at 97–98). Defense counsel responded that the evidence established that it was not Fleming who occupied the property on Cross Creek Drive; rather, it was his cousin Parker who was living there. (Id. at 98).

The trial court accepted the state's reasoning and denied the motion for judgment of acquittal as to the charges for first-degree and fourth-degree burglary. (Id.; Trial Tr. at 193–94). The court also amended the theft charge to theft of a value under $1,000 because the fair rental value Smith testified to at trial was $1,400 to $1,500 per month, and the evidence

---

[1] The notice, which was sent by the Circuit Court pursuant to Md. Rule 2-507, advised Fleming that if he failed to show good cause to defer dismissal in the adverse possession case within thirty days, the case would be dismissed for non-prosecution. (State R. at 92).

established the property was occupied for approximately two weeks. (State R. at 98; Trial

Tr. at 193–94). The state's attorney also entered a nolle prosequi on the charges of trespass

and damage to the property. (Trial Tr. at 182).

The jury returned guilty verdicts on the charges of first-degree burglary, theft under

$1,000, fourth degree burglary, and malicious destruction of property. (Id. at 243). Fleming

was sentenced to ten years for first-degree burglary. (Answer Ex. 3 ["Sentencing Tr."] at

26, ECF No. 7-3). The court imposed no sentence for the remaining counts. (Id. at 27).

**B.    Direct Appeal**

On appeal, Fleming raised three claims: (1) the trial court erred in admitting

irrelevant, highly prejudicial evidence; (2) the trial court erred when it permitted the state

to engage in improper closing argument; and (3) the trial court committed plain error when

it instructed the jury on an offense after finding the state failed to introduce sufficient

evidence to survive a motion for judgment of acquittal. (State R. at 26, 32, 38). In an

unreported decision dated June 21, 2017, the Maryland Court of Special Appeals affirmed

Fleming's conviction. (Id. at 86–104). The mandate was issued on July 21, 2017. (Id. at

105).

With respect to Fleming's first claim, the Court of Special Appeals opined that:

> Appellant argues that the notice [in the adverse
> possession action] comprising State's exhibit 11 was irrelevant
> to the jury's determination of whether he had a good faith
> belief in his ownership interest in the property. We disagree.
>
> Even assuming that appellant was indeed in jail when the
> court sent its notice of impending dismissal of his adverse
> possession claim, there is nothing in evidence to suggest that
> he did not receive it. Appellant has a devoted wife and a family,

and there is no reason to assume that his wife would not have brought an important court document to his attention in jail, had it been mailed to his home address, or that appellant was not otherwise made aware of the notice. Indeed, in his brief, appellant hedges his own argument about his non-receipt of the notice, stating only that he "likely did not receive the notice and had no ability to act on the suit." (Emphasis added)

Moreover, appellant's receipt of the notice and potential reaction thereto do not furnish the only relevance of the notice itself. Regardless of appellant's actual receipt of the notice, the very fact that the notice was issued by the court is relevant to appellant's lack of pursuit of his adverse possession claim and, therefore, his belief in his ownership of the property; the notice indicated that appellant had not pursued the action for a sufficient period of time so as to risk dismissal. The notice of potential dismissal of appellant's adverse possession claim made clear to the jury that appellant had not been granted title to the property by adverse possession by July 23, 2015, which belied the legitimacy of his claim of ownership to DFC Gardner on April 21, 2015.

For similar reasons, we also conclude that the admission of the evidence was not more unfairly prejudicial to appellant than probative. In our view, the jury was more likely to have accepted defense counsel's statement in closing argument— that appellant did not pursue his adverse possession claim through the July 23, 2015 date of the contemplated dismissal notice because he had been placed on notice of Freddie Mac's assertion of its ownership interest in April 2015—than it was to ascribe a prejudicial motive to him. In addition, appellant's claim that the notice was "particularly prejudicial" because he was "essentially precluded from responding to it without eliciting other prejudicial evidence—that he had been in jail," is also refuted, as noted above, by the lack of any evidence tending to prove that he did not receive the notice or was precluded from responding to it as a result of his incarceration.

Even if the court abused its discretion in admitting the notice, any such error would be harmless. See Dorsey v. State, 276 Md. 638, 659 (1976). The other evidence that appellant did not have a good faith belief in his ownership interest in the Cross Creek Drive house was overwhelming. Although

7

establishment of title by adverse possession requires the claimant to show possession that is '"actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted'" for the statutory period of 20 years, Hillsmere Shores Improvement Ass'n, Inc. v. Singleton, 182 Md.App. 667, 691 (2008) (quoting White v. Pines Cmty. Improvement Ass'n, 40[3] Md. 13, 36 (2008)), appellant claimed only to have possessed the property for four or five years, and even that claim was disputed by the testimony of Ms. Smith, Mr. Nack, and Mr. Truitt, all of whom testified that the house was vacant through at least March 23, 2015.  As a result, there is no reasonable possibility that the jury believed that appellant was, or believed himself to be, in legal possession of the property when confronted by the police in April 2015, regardless of the admission of the circuit court's notice of impending dismissal of his adverse possession suit, and any error in the admission of the notice was therefore harmless.

(State R. at 94–96 (footnote omitted)).

The Court of Special Appeals also rejected Fleming's argument that the trial court erred when it permitted the state's attorney to "either misstate the law regarding the charged crimes or to discuss legal principles that went beyond the court's jury instructions during closing arguments." (State R. at 96). During closing argument, the state's attorney argued the following:

Next, he has to intend to deprive the owner of the property, but you do not need to succeed in depriving the owner of the property. You have to intend to do it. And we can't get into somebody's mind, so we look at the circumstances around the case to determine how somebody intended to deprive the owner. And it's ultimately your decision. But here are some quick ones. He files a fraudulent lawsuit . . . He changes all the locks. He rips down the notices on the door . . . There is a Fleming Construction sign on the garage, and he never pays Sheri Smith to this day. Because even if you are an adverse possessor, until the Court orders you saying this is your land, you have to pay the rightful owner of the land.

8

(Id. at 99). The trial court sustained an objection to this argument. (Id.). The state's attorney then continued his closing argument as follows:

> We already talked about his intent to commit theft and how—and you might be saying, wow, your argument is that he intended to steal the house. And you can convict on burglary in the first degree in one of two ways. You could believe that he did all this with the true intent to steal the house, that by filing the fraudulent lawsuit, changing all the locks, putting in a no trespassing sign on his own, ripping down the notices on the door, advertising Fleming Construction on the sign, and never paying Sheri Smith that he intended to steal the house. The other way that he steals the house is that he never pays Sheri Smith. And it's very simple. The law requires that you are using somebody else's—

(Id. at 99–100). The trial court overruled defense counsel's objection to this statement and the state's attorney continued:

> So as I was saying, when you exert influence, whether by allowing your blind cousin who is going through a messy domestic situation to live there or you live there, yourself, there is an obligation to pay the true owner money for using the time. And that's all the different ways in which the defendant can commit burglary of this house. Remember, the defendant has legally represented to Vaughn Parker, when he asks how can I live here, the defendant represented it's legal. He says it's his property.

(Id. at 100). The Court of Special Appeals found that the state's attorney did not "impermissibly argue the law," noting that "the first instance in which the prosecutor made any mention of the law, that is, that payment of the value of the property is required by an unauthorized user of the property to the rightful owner, was met with an objection" and because that objection was sustained, the jury was precluded from considering it. (Id.). The Court of Special Appeals further noted that the "only arguable reference to the law occurred

9

when the prosecutor continued his argument after the lengthy bench conference, stating that 'there is an obligation to pay the true owner money for using the time.'" (Id. at 101). The Court of Special Appeals, however, was ultimately "not persuaded" that the arguments advanced by the state's attorney constituted improper comment on the law or that it "created a danger of manipulation of the court's binding instructions such that the jury applied law other than that instructed by the trial court." (Id.).

As for his third argument, Fleming asserted that the jury improperly convicted him of a crime the state had failed to prove because the trial court erroneously instructed the jury "it could convict [Fleming] of theft only if the value of the property taken was over $1000," even though the trial court had determined the evidence did not support such a charge and permitted an amendment of the indictment to charge Fleming with theft under $1,000. (Id. at 101). The Court of Special Appeals noted that while "the instruction was an inadvertent misstatement by the court after amendment to the indictment," the trial court later "made clear to the jury . . . that the verdict sheet contained charges of 'burglary first degree,' 'theft less than $1000,' 'burglary fourth degree,' and 'malicious destruction.'" (Id. at 103). Further, the trial court instructed the jury it could only consider the charges on the verdict sheet; the state's attorney clarified that the value of the property was under $1,000 as the fair rental value; and the jury was asked "how it found on the charge of 'theft less than $1000,' and its verdict was harkened as to that charge." (Id. at 103–04). The appellate court therefore rejected the notion that Fleming was denied a fair trial by the trial judge's initial misstatement in the jury instruction. (Id. at 104).

In his self-represented petition for writ of certiorari to the Maryland Court of Appeals, Fleming raised the same three claims without additional argument. (See id. at 106–09). The petition was denied on September 22, 2017. (Id. at 110).

## C.   Post-Conviction Proceedings

During the pendency of his direct appeal, Fleming initiated his first post-conviction proceeding, a pro se petition under Maryland's Uniform Postconviction Procedure Act ("UPPA"), Md. Code Ann., Crim. Proc. § 7-101 et seq. By order dated January 15, 2018, the Circuit Court for Wicomico County granted Fleming's motion to withdraw the petition without prejudice to refiling. (State R. at 4). Fleming filed a second petition on May 30, 2018, this time with the assistance of post-conviction counsel. (Id. at 111–15).

Among other claims, Fleming alleged that trial counsel had been constitutionally ineffective for failing to move for judgment of acquittal on the ground that the state had not proved that the home was a dwelling for the purpose of the burglary statute. (Id. at 112). Specifically, Fleming alleged that his attorney should have argued the house was not a dwelling "due to the heating system having to be replaced" and because "there was no stove, refrigerator, washer or dryer in the house." (Id.). In an order dated October 31, 2018, the Circuit Court rejected this argument, reasoning that:

> At the Post-Conviction hearing, Petitioner stated that Trial Counsel was deficient for failing to argue, at Motion for Judgment of Acquittal, that the house was not a dwelling because it was in an unlivable condition. If the house he allegedly burglarized were not a dwelling, he could not have been convicted of First Degree Burglary. In support of this allegation, the Petitioner testified that the house did not have electricity, nor water, and therefore, was not livable. This contradicted the testimony of Ms. Smith at trial, as she testified

11

to having electrical service and running water restored. The Petitioner also testified at the Post-Conviction hearing that the house had heating issues and that the roof had issues. Because, according to Petitioner at the Post-Conviction hearing, it was the middle of winter, which he testified as March, these issues also made the house unlivable.

This allegation lacks merit. At the trial, Trial Counsel made a Motion for Judgment of Acquittal. In seeking acquittal as to the First Degree Burglary Count, she argued that the State had failed to prove a breaking and entering, that there was no evidence of theft/intent to commit a theft, and that there was no requisite criminal intent because the Petitioner believed that the documents in his possession gave him control over the property. Trial Tr. Apr. 6, 2016, 174-75. This lack of intent, not lack of livability, was central to the defense and central, in particular, to the argument advanced in support of the motion for judgment of acquittal as to the burglary count. This was sound trial strategy by Trial Counsel, who skillfully argued her motion. In that argument, she demonstrated a clear understanding of the facts and evidence, and made sound legal arguments based on those facts and evidence.

As to Trial Counsel's reasons for not arguing that the house was not a dwelling, Trial Counsel testified at the Post-Conviction hearing that she did not believe the facts supported that argument at the trial. This Court agrees. Ms. Smith had testified that she had turned on the electricity, which would have ensured electricity and running water. Moreover, Mr. Vaughn's testimony confirmed that there was running water. He testified that, prior to moving into the residence, he paid for a new hot water heater to have hot water, which means, obviously, that the house had running water. Trial Tr. Apr. 6, 2016, 123, 127. Therefore, the unrefuted testimony was that the residence had running water and electricity, and there was no basis for the argument that the house was not a dwelling.

Notably, the Supreme Court has held that "[r]are are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." Harrington v. Richter, 562 U.S. 86, 89 (2011) (internal quotations omitted). Further, the law provides that if trial counsel has a sound tactical reason for her action, a court

12

may not deem the action deficient, State v. Matthews, 58 Md.App. 243 (1984), and, additionally, trial counsel should not be faulted for failing to pursue a strategy for which there is no supporting evidence, Gillam v. State, 331 Md. 651 (1993), cert. denied, 510 U.S. 1077 (1994).

With regard to this allegation, the Court finds that Trial Counsel had a sound strategy for the arguments she advanced, and a sound strategy for not advancing the "livability" argument. Thus, the Strickland standard has not been met. Accordingly, there is no basis to grant relief under this allegation.

(State R. at 123–25 (footnotes omitted)).

Fleming filed a timely pro se application for leave to appeal. (Id. at 130–32). In the application, Fleming did not raise his claim that the dwelling was unlivable, instead arguing that his conviction had been in error because the state had failed to introduce the lockboxes into evidence. (Id. at 131). The Court of Special Appeals summarily denied his application on February 21, 2019, and the mandate issued on March 26, 2019. (Id. at 133–35). This exhausted all available forms of direct review of Fleming's conviction. See Md. Code Ann., Cts. & Jud. Proc. § 12-202(4); Stachowski v. State, 6 A.3d 907, 913–14 (Md. 2010) (explaining, in the context of a guilty plea and probation violation, that when the Court of Special Appeals summarily denies leave to appeal, § 12-202 divests the Court of Appeals of Maryland of certiorari jurisdiction to review the case any further).

**D.  Federal Habeas Petition**

Fleming, who is proceeding pro se, timely filed his Petition on April 9, 2019. (ECF No. 1). Respondent filed its Response to the Petition on June 17, 2019. (ECF No. 7). On

June 20, 2019, the Court advised Fleming of his right to file a Reply. (ECF No. 8). Fleming

filed his Reply on September 18, 2019. (ECF No. 10).

## II.   DISCUSSION

### A.   <u>Standard of Review</u>

An application for writ of habeas corpus may be granted only for violations of the

Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute

sets forth a "highly deferential standard for evaluating state-court rulings." <u>Lindh v.</u>

<u>Murphy</u>, 521 U.S. 320, 333 n.7 (1997); <u>see also</u> <u>Bell v. Cone</u>, 543 U.S. 447, 455 (2005).

The standard is "difficult to meet" and requires courts to give state-court decisions the

benefit of the doubt. <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) (citations omitted); <u>see</u>

<u>also</u> <u>White v Woodall</u>, 572 U.S. 415, 419–20 (2014) (finding that a state prisoner must

show that the state court ruling on the claim presented in federal court was "so lacking in

justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement" (quoting <u>Harrington v. Richter</u>, 562

U.S. 86, 101 (2011)).

A federal court may not grant a writ of habeas corpus unless the state's adjudication

on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States; or (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d). A state adjudication is contrary to clearly established federal law under

§ 2254(d)(1) where the state court (1) "arrives at a conclusion opposite to that reached by

14

[the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." Williams v. Taylor, 529 U.S. 362, 405 (2000) (citation omitted).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." Id. (quoting Williams, 529 U.S. at 410).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010) (citing Williams, 529 U.S. at 411). Thus, "even if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. Id. (internal quotation marks and citation omitted). Similarly, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." Renico v. Lett, 559 U.S 766, 773 (2010) (quoting Williams, 529 U.S. at 411).

The habeas statute provides that "a determination of a factual issue made by a state court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." <u>Sharpe v. Bell</u>, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." <u>Id.</u> (quoting <u>Wilson v. Ozmint</u>, 352 F.3d 847, 858 (4th Cir. 2003)).

**B.**     <u>**Analysis**</u>

    **1.**     **Trial-Court Error**

In his Petition, Fleming advances three claims of relief founded on error by the trial court: (1) the trial court erred when it permitted the prosecutor to misstate the law governing adverse possession during closing arguments; (2) the trial court admitted irrelevant and prejudicial evidence showing that Fleming's adverse possession suit was going to be dismissed for inaction; and (3) the trial court erred when it instructed the jury on theft over $1,000 after finding the state had not proved such an offense. Respondent asserts that Fleming fails to raise a cognizable claim for federal habeas relief because these arguments are grounded solely on matters of state law. For the reasons outlined below, the Court agrees with Respondent.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991) (citing 28 U.S.C. § 2241; <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975)). "Federal courts may not issue writs of

16

habeas corpus to state prisoners whose confinement does not violate federal law." Wilson v. Corcoran, 562 U.S. 1, 1 (2010). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply de novo review of factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge." Davis v. Ayala, 576 U.S. 257, 276 (2015) (internal quotation marks and citation omitted). As a result, a state court's procedural, evidentiary, and instructional rulings are generally not a basis for federal habeas relief. See generally Crane v. Kentucky, 476 U.S. 683, 689 (1986) (noting the Supreme Court's "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts").

Here, Fleming's assertions that the trial court erred regarding statements made during closing arguments, admission of evidence, and jury instructions implicate questions of state law, not clearly established rights guaranteed by federal law or the U.S. Constitution. See, e.g., Estelle, 502 U.S. at 71–72 ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief.") (citation omitted); Cupp v. Naughten, 414 U.S. 141, 146 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."); Grandison v. Corcoran, 78 F.Supp.2d 499, 507 (D.Md. 2000) ("Generally, questions of jury instructions are matters of state law, not cognizable on federal habeas review, unless a specific constitutional issue is implicated that calls into question the Due Process Clause.") (citing Sandstrom v. Montana, 442 U.S. 510 (1979));

17

Spencer v. Murray, 18 F.3d 237, 239–40 (4th Cir. 1994) (noting that claims regarding admissibility of evidence that neither relied upon a constitutional provision, nor mentioned a constitutional right infringed, did not state a federal claim). Thus, these claims are not cognizable in a federal habeas suit. This Court declines to second-guess the ordinary evidentiary and procedural rulings by the trial court or the Court of Special Appeals' well-stated analysis of Maryland law as it applies to these claims. Accordingly, Fleming's claims must fail.

### 2.    Ineffective Assistance of Counsel

Fleming also alleges in his Petition that trial counsel was constitutionally ineffective because she failed to move for judgment of acquittal on the ground that the state had failed to prove the home was a "dwelling" for the purpose of the burglary statute. Respondent contends that this claim fails because it is both unexhausted and procedurally barred. Once again, the Court agrees with Respondent.

In his post-conviction proceedings, Fleming failed to exhaust his allegation that defense counsel was constitutionally ineffective for failing to argue in support of the motion for judgment of acquittal that the home was not a dwelling. As stated above, although Fleming raised this claim in his post-conviction proceedings before the Circuit Court, he failed to argue it as part of his application for leave to appeal. (State R. at 130–31). Accordingly, this claim is unexhausted. See 28 U.S.C. § 2254(b).

This claim is also procedurally defaulted because it can no longer be raised in state court. When a claim has not been properly exhausted, the Court may find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that

18

the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile. <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1991) (finding that a procedural default occurs when a habeas petitioner fails to exhaust available State remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred") (citations omitted). In Maryland, a criminal defendant is limited to one post-conviction proceeding, which, once finally resolved, cannot be reopened unless necessary "in the interests of justice." Md. Code Ann., Crim. Proc. §§ 7-103(a), 7-104. State law is clear that when, as here, a petitioner simply omits an assignment of error from an application for leave to appeal, reopening is not in the interests of justice simply to adjudicate the same claim. <u>Id.</u> § 7-102 (providing that a post-conviction claim is subject to waiver); <u>id.</u> § 7-106(b)(2) (providing that a rebuttable presumption arises that a petitioner has knowingly and intelligently waived an allegation when the petitioner defaults upon the allegation in a prior post-conviction proceeding). Because the post-conviction court expressly rejected Fleming's ineffective assistance of counsel claim related to his dwelling theory of acquittal, and because Fleming did not argue that claim in his application for leave to appeal, it may no longer be raised in any form of state post-conviction proceeding and is therefore procedurally barred. Accordingly, Fleming's ineffective assistance claim is dismissed with prejudice to refiling.

**3.     Brady[2] Claims**

Fleming asserts for the first time in his Reply that he was the victim of a Brady violation. To the extent that Fleming is attempting to bootstrap a federal claim to his Petition through his Reply, this attempt must fail. Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether by failing to raise the claim in post-conviction proceedings, on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. See Coleman, 501 U.S. at 749–50 (failure to note timely appeal); Murray v. Carrier, 477 U.S. 478, 489–91 (1986) (failure to raise claim on direct appeal); Murch v. Mottram, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); Bradley v. Davis, 551 F.Supp. 479, 481 (D.Md. 1982) (failure to seek leave to appeal denial of post-conviction relief). A procedural default may also occur where a state court declines to consider the merits of a claim based on an adequate and independent state procedural rule. Yeatts v. Angelone, 166 F.3d 255, 260 (4th Cir. 1999).

As the Fourth Circuit has explained:

> If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. See Coleman v. Thompson, 501 U.S. 722, 731–32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Id. at 735 n.1.

---

[2] Brady v. Maryland, 373 U.S. 83, 87 (1963).

Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998).

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, i.e., the conviction of one who is actually innocent.[3] See Murray, 477 U.S. at 495–96; Breard, 134 F.3d at 620. Cause consists of some objective factor external to the defense that impeded counsel's efforts to raise the claim in state court at the appropriate time. Breard, 134 F.3d at 620 (quoting Murray, 477 U.S. at 488). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. See Schlup v. Delo, 513 U S. 298, 314 (1995).

Fleming failed to present his purported Brady claims to the state courts for consideration and he no longer has an avenue to do so. Therefore, these claims are procedurally defaulted. Fleming also offers no cause for the procedural default, nor can the

---

[3] Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. See Murray, 477 U.S. at 496. "[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Id.; see also Reid v. True, 349 F.3d 788, 806 (4th Cir. 2003). Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of new evidence. See Buckner v. Polk, 453 F.3d 195, 199–200 (4th Cir. 2006) (citation omitted).

record support a basis for cause. Because the asserted errors were adequately addressed on well-established state law, there has been no fundamental miscarriage of justice warranting the issuance of a writ of habeas corpus in this case. Accordingly, the Petition must be denied.

**C.    Certificate of Appealability**

A certificate of appealability may be issued only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); see Buck v. Davis, 137 S.Ct. 759, 773 (2017). Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (citation omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citation omitted). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. See 28 U.S.C. § 2253(c)(2). Fleming may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. See Lyons v. Lee, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

### III.    CONCLUSION

For the foregoing reasons, Fleming's Petition for Writ of Habeas Corpus will be dismissed and a certificate of appealability will not be issued. A separate Order follows. So ordered this 22nd day of February, 2021.

_____/s/_____
George L. Russell, III
United States District Judge